**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

**MARK JARRELL,**

      **Plaintiff,**

**v.**                          **Case No.: 3:18-cv-00490**

**NANCY A. BERRYHILL,
Acting Commissioner of
Social Security,**

      **Defendant.**

## PROPOSED FINDINGS AND RECOMMENDATIONS

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's applications for a period of disability and disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. The matter is assigned to the Honorable Robert C. Chambers, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending are Plaintiff's Motion for Summary Judgment and the Commissioner's brief in support of her decision, requesting judgment in her favor. (ECF Nos. 11, 12).

The undersigned has fully considered the evidence and the arguments of counsel. For the following reasons, the undersigned **RECOMMENDS** that Plaintiff's Motion for Summary Judgment be **DENIED**; the Commissioner's request for judgment on the

1

pleadings be **GRANTED**; the Commissioner's decision be **AFFIRMED**; and this case be **DISMISSED** and removed from the docket of the Court.

## I.    <u>Procedural History</u>

On September 3, 2014, Plaintiff Mark Jarrell ("Claimant"), completed applications for DIB and SSI, alleging a disability onset date of August 14, 2014 due to "renal cell carcinoma, gastroesophageal reflux disease, hypertension, migraine headaches, temporal arteritis, and osteoarthritis." (Tr. at 261-87, 301). The Social Security Administration ("SSA") denied Claimant's applications initially and upon reconsideration. (Tr. at 14). Claimant then filed a request for an administrative hearing, which was held on April 18, 2017 before the Honorable Melinda Wells, Administrative Law Judge. (Tr. at 36-67). At the hearing, Claimant amended his alleged onset date to June 4, 2015. (Tr. at 57). By written decision dated May 18, 2017, the ALJ found that Claimant was not disabled as defined by the Social Security Act. (Tr. at 11-35). The ALJ's decision became the final decision of the Commissioner on February 3, 2018 when the Appeals Council denied Claimant's request for review. (Tr. 1-6).

Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner subsequently filed an Answer opposing Claimant's complaint and a Transcript of the Administrative Proceedings. (ECF Nos. 9, 10). Claimant filed a Motion for Summary Judgment and brief in support, the Commissioner filed a Brief in Support of Defendant's Decision, and Claimant filed a reply. (ECF Nos. 11, 11-1, 12, 13). Consequently, the matter is fully briefed and ready for resolution.

## II.    <u>Claimant's Background</u>

Claimant was 52 years old on his amended alleged onset date and 54 years old on

the date of the ALJ's decision. (Tr. at 27). Claimant completed high school and previously worked for over 26 years as an owner-operator truck driver. (Tr. at 302).

### III.    <u>Summary of ALJ's Decision</u>

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." *Id.* If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* §§ 404.1520(d), 416.920(d). If so, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must assess the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* §§ 404.1520(e), 416.920(e). After making this

determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* §§ 404.1520(f), 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, in the fifth and final step of the process, that the claimant is able to perform other forms of substantial gainful activity, given the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. §§ 404.1520(g), 416.920(g); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d. 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at each level in the administrative review process," including the review performed by the ALJ. 20 C.F.R. §§ 404.1520a(a), 416.920a(a). Under this technique, the ALJ first evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* §§ 404.1520a(b), 416.920a(b). If an impairment exists, the ALJ documents his findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in *Id.* §§ 404.1520a(c), 416.920a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. *Id.* §§ 404.1520a(d), 416.920a(d). A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes

of decompensation of extended duration) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* §§ 404.1520a(d)(1), 416.920a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* §§ 404.1520a(d)(2), 416.920a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the ALJ assesses the claimant's residual mental functional capacity. *Id.* §§ 404.1520a(d)(3), 416.920a(d)(3). The regulations further specify how the findings and conclusion reached in applying the technique must be documented by the ALJ, stating:

> The decision must show the significant history, including examination and laboratory findings, the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(4), 416.920a(e)(4).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status for disability insurance benefits through December 31, 2018. (Tr. at 16, Finding No. 1). At the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity since August 14, 2014, the alleged disability onset date. (*Id.*, Finding No. 2). At the second step of the evaluation, the ALJ found that Claimant had the following severe impairments: degenerative disc disease of the cervical and lumbar spines, degenerative joint disease of the right shoulder, and migraine headaches. (Tr. at 16-18, Finding No. 3). The ALJ considered Claimant's reported joint

pain, particularly knee pain; hypertension; gastroesophageal reflux disease; history of laparoscopic cholecystectomy, colonoscopy with snare polypectomy, and renal cancer with partial nephrectomy; benign prostatic hypertrophy; and major depressive disorder. (Tr. at 18-21). However, the ALJ found such impairments to be non-severe. (*Id.*).

Under the third inquiry, the ALJ concluded that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 21-22, Finding No. 4). Accordingly, the ALJ determined that Claimant possessed:

> [T]he residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) *except* must be able to alternate sitting and standing every 30 minutes without leaving the workstation; should only occasionally push/pull with the right upper extremity; never climb ladders, ropes, or scaffolds; never crawl; never reach overhead with the right upper extremity; and should never work at unprotected heights or around moving machinery.

(Tr. at 22-27, Finding No. 5). At the fourth step, the ALJ determined that Claimant could not perform any of his past relevant work. (Tr. at 27, Finding No. 6). Therefore, the ALJ reviewed Claimant's past work experience, age, and education in combination with his RFC to determine his ability to engage in other substantial gainful activity. (Tr. at 27-28, Finding Nos. 7 through 10). The ALJ considered that (1) Claimant was born in 1963 and was defined as a person closely approaching advanced age on the alleged disability onset date through the date of the decision; (2) he had at least a high school education and could communicate in English; and (3) transferability of job skills was not an issue because the Medical-Vocational Rules supported a finding that Claimant was "not disabled," regardless of his transferable job skills. (Tr. at 27, Finding Nos. 7 through 9). Taking into account these factors, Claimant's RFC, and the testimony of a vocational expert, the ALJ determined that Claimant could perform other jobs that existed in significant numbers in

the national economy, including unskilled light-level work as a small parts assembler, label coder, or mail clerk. (Tr. at 27-28, Finding No. 10). Consequently, the ALJ concluded that Claimant was not disabled as defined by the Social Security Act and was not entitled to benefits. (Tr. at 28, Finding No. 11).

## IV.   <u>Claimant's Challenges to the Commissioner's Decision</u>

Claimant raises two challenges to the Commissioner's decision. First, Claimant argues that the ALJ failed to fully account for his migraine headaches in the RFC finding. (ECF No. 11-1 at 3-8). Claimant contends that the only limitations that the ALJ imposed in his RFC that arguably related to his migraine headaches were the restrictions that he never work at unprotected heights or around moving machinery. (*Id.* at 5). Claimant suggests that the ALJ should have additionally limited his exposure to light and noise and his ability to remain on task, because, according to Claimant, the ALJ did not dispute Claimant's allegations or the evidence in the record documenting that Claimant suffered from at least two migraines per month, lasting for two to three days at a time, which caused  him photophobia and phonophobia and required him to lie down in a dark, quiet room until the migraines resolved. (*Id.* at 4-6). Claimant argues that the absence of a noise-related limitation was critical because the jobs which the ALJ found that Claimant could perform involved moderate and loud noise intensity levels. (*Id.* at 6). Further, Claimant states that the ALJ's failure to include an off-task limitation in the RFC finding was significant because the vocational expert testified at his administrative hearing that being off task for even 15 percent of the work day, or absent from work two times per month during the probationary period of a job, would preclude all substantial gainful activity. (*Id.* at 7).

In his second challenge to the Commissioner's decision, Claimant argues that the ALJ did not properly evaluate the June 4, 2015 physical capacities evaluation provided by his treating physician, Dawn MacFarland, M.D. (ECF No. 11-1 at 8-20). Claimant cites Dr. MacFarland's assessment that Claimant could sit for less than two hours and stand/walk for less than two hours in a work day; needed to lie down at unpredictable intervals during the day; could never lift/carry any weight; and would miss more than three days of work per month due to his impairments. (*Id.* at 9-10). Claimant argues that even if Dr. MacFarland's opinion was partially credited to find that Claimant was limited to sedentary work, the Medical Vocational Guidelines (Grid Rules) would direct a finding of disability due to his age and vocational factors. (*Id.* at 10-11). Claimant contends that the ALJ failed to provide good, specific, and supported reasons for rejecting Dr. MacFarland's opinion and the reasons that the ALJ did supply were unclear and an incorrect interpretation of the record. (*Id.* at 12-20).

In response to Claimant's challenge regarding his migraine headaches, the Commissioner states that there is no objective evidence that Claimant experienced light or noise sensitivities, or that he reported such complaints to his treating physicians. (ECF No. 12 at 8). Additionally, the Commissioner asserts that there is no evidence that Claimant had a medical need to lie down in a dark, quiet room. (*Id.*). Rather, the Commissioner points to evidence that Claimant reported periodic migraines, but stated that Maxalt provided some benefit and he did not need to use it often. (*Id.*). The Commissioner also notes that Claimant reported on various occasions that he did not have headaches. (*Id.* at 8-9). Overall, the Commissioner argues that the ALJ fully complied with the law by explicitly considering the medical and non-medical evidence concerning Claimant's migraines and explaining that no further RFC limitations were warranted

given the fact that medication was beneficial in reducing Claimant's symptoms; Claimant did not have any focal neurological deficits; and Claimant was not referred for any additional testing or more aggressive medical management. (*Id.* at 9).

In response to Claimant's second assertion of error regarding Dr. MacFarland's opinion, the Commissioner argues that "the ALJ gave good and specific reasons, which were well-documented by overwhelming objective medical evidence in the record, for affording little weight to the unsupported extreme limitations in the 'check-box' form completed by Dr. MacFarland." (*Id.* at 11). The Commissioner asserts that Dr. MacFarland's reliance on Claimant's subjective complaints in forming her opinion—especially when those complaints were inconsistent with Dr. McFarland's own clinical notes—provided a sound justification for the ALJ not to give the opinion controlling weight. (*Id.* at 15-16). The Commissioner additionally points out that Dr. MacFarland's opinion was merely a form consisting of check boxes without any narrative explanation or supporting evidence of the extreme limitations that she assessed. (*Id.* at 17). The Commissioner cautions that the determination of a claimant's RFC is an administrative function reserved to the Commissioner. She adds that it is not the province of this Court to re-weigh opinion evidence when more than a scintilla of evidence supports the ALJ's analysis of Dr. MacFarland's opinion and Claimant's RFC. (*Id.* at 19-20).

Claimant filed a reply to the Commissioner's brief. Claimant contends that the Commissioner's argument that there was no objective evidence in the record to demonstrate that Claimant experienced light or noise sensitivity is a *post hoc* rationalization, as the ALJ never explicitly stated that as a basis for the RFC finding. (ECF No. 13 at 2). Furthermore, Claimant argues that although the ALJ may have disputed the frequency, intensity, or limiting effects of his migraines, the ALJ did not disagree that

Claimant suffered from migraines at some frequency, nor did the ALJ dispute Claimant's reported symptoms of light and sound sensitivity. (*Id.* at 3). Therefore, Claimant argues that because the ALJ found that medicine only reduced and provided some benefit in treating his migraine symptoms, the ALJ should have included RFC limitations to account for Claimant's limitations during his migraines or explained why further limitations were not necessary. (*Id.*).

Regarding Dr. MacFarland's opinion, Claimant emphasizes in his reply that the ALJ failed to discuss the multiple factors that weighed in favor of crediting Dr. MacFarland's statements and focused only on the factors that the ALJ found weighed against them. (*Id.* at 4). In addition, Claimant states that the Commissioner's description of the opinion as a "check-box" form is further *post hoc* rationalization that was not mentioned by the ALJ. Claimant argues that such an assertion is incorrect in any event, because the opinion provided narrative descriptions of Claimant's diagnoses, prognoses, pain, side effects, and other notes. (*Id.*).

## V.    <u>Relevant Evidence</u>

The undersigned has reviewed all of the evidence before the Court. The information that is most pertinent to Claimant's challenges is summarized as follows:

### *A. Treatment Records*

#### 1. Before alleged onset of disability

On September 24, 2014, Claimant saw Dr. MacFarland due to his recent diagnosis of renal cancer. (Tr. at 773). During that visit, Claimant stated that the back pain that he suffered for years was worsening and that his back was sometimes so stiff that it was hard to walk. (Tr. at 773). Claimant also reported that he had a headache and a history of severe

headaches. (Tr. at 774). On examination, Claimant had decreased range of motion in his spine due to pain, but no neurological issues. (*Id.*).

On November 11, 2014, Claimant presented to family nurse practitioner Jessica Hicks in preparation for his upcoming partial nephrectomy. (Tr. at 499-501). He complained of "joint pain all over" and stated that he had a history of headaches. (Tr. at 499, 500). Claimant was already taking a Norco tablet at night and had a prescription for oxycodone to take as needed for severe pain. (*Id.*). On examination, Claimant had normal muscle tone, bulk, and strength; no crepitus; normal range of motion; and he was grossly intact neurologically with no focal deficits. (Tr. at 500). Claimant was cleared for his surgery. (*Id.*).

Claimant followed up with Dr. MacFarland on February 9, 2015, stating that his joint pain became much worse in the past year and was aggravated by even a small amount of activity. (Tr. at 613). Claimant claimed that pain medication helped, but that the pain still interfered with his ability to sleep. (*Id.*). He denied having a headache on his review of systems. (Tr. at 614). On examination, Claimant had normal muscle tone, bulk, and strength, but he had crepitus in his knees and left shoulder. (*Id.*). Claimant exhibited decreased range of motion in his neck, shoulders, and arms. (*Id.*). He could only raise his arms to 90 degrees. (*Id.*). He related that he sometimes felt a burning and numb feeling in his hands and dropped things. (*Id.*).

On February 26, 2015, an x-ray was taken of Claimant's cervical spine, which showed minimal retrolisthesis of his C5 and C6 vertebrae, degenerative disc disease at C5-C6 and C6-C7, mild left neural foraminal stenosis at C6-C7, and right neural foraminal stenosis at C5-C6. (Tr. at 617). X-rays were also taken of Claimant's shoulders, but they did not reveal any issues. (*Id.*).

The following month, Claimant presented to Nurse Hicks on March 16, 2015. He reported that his migraines returned in the past two to three years. (Tr. at 609). Claimant stated that in the past two weeks, he had two bad migraine episodes and he "[got] where [the] room was dark and quiet." (*Id.*). Claimant claimed that Excedrin and oxycodone did not help his symptoms. (*Id.*). In terms of his musculoskeletal complaints, Claimant stated that he was taking Neurontin for his neck pain and noticed that his hands were not as "achy." (*Id.*). However, Claimant reported that he had joint pain all of the time, which was the worst in his shoulders. (*Id.*). He stated that it was "hard to get dressed" and his wife had to help him. (*Id.*). Claimant related that Norco relieved some of the pain, but it still hurt to lie in bed at night, which is when he normally ended up taking the medication. (*Id.*). Nevertheless, Claimant's musculoskeletal and neurological examinations revealed normal results. (Tr. at 610). Claimant was prescribed Maxalt for his migraines and continued on Neurontin for his neuropathic pain. (Tr. at 611). He was instructed to continue narcotic pain management with Dr. MacFarland. (*Id.*).

During Claimant's subsequent appointment with Dr. MacFarland on May 7, 2015 Claimant stated that his right shoulder was exquisitely tender and the pain in that area only ceased when he did not move at all. (Tr. at 573). Claimant described the pain as breathtaking and sharp. He stated that his pain medications did not provide him relief "when the sharp pain grab[bed]" a hold of him. (*Id.*). Claimant's wife expressed that Claimant "moan[ed] all night now." (*Id.*). On his review of systems, Claimant denied having a headache, weakness, or muscle pain. (*Id.*). Claimant had a normal muscular examination and no joint crepitus, but his range of motion was limited in his right shoulder. (Tr. at 574). Claimant could abduct his shoulder to 90 degrees and could barely reach over to his other shoulder. (*Id.*). He was neurologically intact, with no focal deficits,

12

but stated that his arms and hands became numb when his arms dangled to his sides or when he lay on his back and crossed his arms on his chest. (*Id.*). Dr. MacFarland ordered MRIs of Claimant's right shoulder and neck and renewed his prescriptions for Norco and OxyContin. (*Id.*). Claimant was also participating in physical therapy. (*Id.*).

### 2. After alleged onset of disability

On June 4, 2015, Claimant followed up with Dr. MacFarland. He continued to have bilateral shoulder and neck pain, which was much worse on the right. Claimant stated that the pain "t[ook] him to [his] knees at times." (Tr. at 576). Claimant further reported that his migraine headaches were "still the same" and that Maxalt helped some, but he did not use it often. (*Id.*). Claimant's muscle tone and strength and his range of motion were decreased in his right arm and shoulder. (Tr. at 577). He again reported right arm numbness, but he was noted to be grossly intact neurologically without any focal deficits. (*Id.*). Dr. MacFarland assessed that Claimant's shoulder pain was caused by right neural foraminal stenosis in his cervical spine at C5-C6, as well as osteoarthritis. (*Id.*). She was still trying to obtain insurance authorization for an MRI. (*Id.*). Claimant was continued on the pain medication Norco. (*Id.*).

On July 24, 2015, Claimant was discharged from physical therapy after completing ten sessions, because the treatment conferred "little to no benefit" in improving his range of motion and reducing his pain. (Tr. at 555). His physical therapist stated that, despite therapy, Claimant continued to demonstrate significant limitations with the use of his right upper extremity, which affected his neck, shoulder, elbow, and hand. He additionally experienced left shoulder pain. (*Id.*).

On August 4, 2015, MRIs were taken of Claimant's right shoulder and cervical spine. (Tr. at 616). Claimant had a small partial thickness articular surface tear of the

13

supraspinatus tendon in his right shoulder. (*Id.*). In his cervical spine, he had multilevel degenerative changes with multilevel foraminal narrowing, including a herniated disc at C4-C5. (*Id.*).

Claimant followed up with Nurse Hicks on August 12, 2015. (Tr. at 579). He continued to complain of neck and back pain and numbness and tingling in his arms, stating that they felt like they were "going to sleep." (Tr. at 579). Claimant asserted that Neurontin helped his pain and tingling, and steroids and Toradol helped his symptoms "quite a bit." (*Id.*). He denied having a headache. (*Id.*). On examination, Claimant had normal muscle tone, bulk, and strength; no crepitus; normal range of motion; no focal deficits; and he was noted to be grossly intact neurologically. (Tr. at 580). Claimant was referred to an orthopedist regarding his shoulder pain and to a neurosurgeon for his neck pain, at his request. (*Id.*).

On August 18, 2015, Claimant was examined by a neurosurgeon, Panos Ignatiadis, M.D. Claimant had "some" back and hip pain, but stated that his main problem was his right shoulder. (Tr. at 648). Claimant had difficulty raising his arm and grasping things, specifically above the horizontal plane. (*Id.*). Claimant also had chronic neck pain that occasionally radiated into his right index and little finger, "but not overwhelming so." (*Id.*). On examination, Claimant had full cervical and lumbar range of motion; no paraspinal muscle spasm or point tenderness; excellent strength in his extremities without any evidence of myelopathy or radiculopathy; and intact sensation and deep tendon reflexes. (Tr. at 649). However, he was unable to raise his arm above 80 degrees, was restricted in internal and external rotation, and had a positive impingement sign. (*Id.*). Dr. Ignatiadis stated that Claimant's MRI showed degenerative changes with stenosis at C5-C6 without any intimacy to the spinal cord. (Tr. at 650). He assessed that

14

Claimant's partial rotator cuff tear in his right shoulder restricted his movement and caused pain. (*Id.*). In addition, Claimant had degenerative changes with osteophytic overgrowth inducing C5-C6 radiculopathy on Claimant's right side. (*Id.*). Dr. Ignatiadis referred Claimant to an orthopedist, Adam Dann, D.O., and stated that he would reassess Claimant if his neck symptoms persisted. (*Id.*).

On October 28, 2015, Claimant again saw Nurse Hicks. He complained of a headache, hardening of the arteries in his head, and joint pain all over, but he denied muscle pain or weakness. (Tr. at 582). Claimant's musculoskeletal and neurological examinations were normal, including normal range of motion and no focal deficits. (*Id.*).

On December 22, 2015, Claimant followed up with Dr. Ignatiadis. (Tr. at 645). His pain had improved considerably to the point that he rated his neck pain 2 or 3 on a ten-point scale. (*Id.*). Claimant still had some back pain without radiculopathy and numbness in his thumb and index finger. (*Id.*). On examination, Claimant had full range of motion in his cervical and lumbar spine; no paraspinal muscle spasm or point tenderness; and normal motor examination, deep tendon reflexes, and gait. (Tr. at 646-47). However, Claimant had decreased sensation in the C6 nerve distribution. (Tr. at 646). Dr. Ignatiadis diagnosed Claimant with chronic cervical radiculopathy on his right side in the C6 nerve root distribution. (Tr. at 647). He provided Claimant with exercise booklets for the neck and lower back and stated that Claimant could return for reassessment if his symptoms worsened. (*Id.*).

Early the next year, on March 10, 2016, x-rays were taken of Claimant's thoracic and lumbar spine. The study of his thoracic spine was a negative. Claimant had mild to moderate degenerative changes in his lumbar spine. (Tr. at 734, 735).

On April 5, 2016, Claimant again followed up with Dr. Ignatiadis. (Tr. at 642). Dr. Ignatiadis stated that Claimant's shoulder had improved, although he still had some residual pain and difficulty raising his arm above his head. (*Id.*). Claimant also reported pain in his neck, arms, back, and legs, as well as numbness in his thumbs. (*Id.*). Claimant's motor and sensory examinations were normal, but he had decreased motility of the lumbar spine by 50 percent. (Tr. at 643-44). Claimant's deep tendon reflexes were also largely normal, except that they were decreased in his biceps and mildly decreased in his right knee. (Tr. at 644). Claimant had a normal gait, and his straight leg raising test was positive at 45 degrees on the right and negative on the left. (*Id.*). Dr. Ignatiadis diagnosed Claimant with bilateral radiculopathy from his bulging disc at C5-C6 with residual degenerative right shoulder disease. (*Id.*). There was also evidence that Claimant suffered from radiculopathy of the lumbar spine in the L4-L5 nerve distribution. (*Id.*). Dr. Ignatiadis recommended an MRI in order to determine what treatment was appropriate for Claimant. (*Id.*).

Claimant followed up with his oncologist later that year on October 13, 2016. His scans were stable. (Tr. at 662). He denied having a headache, but complained of joint pain and stiffness and sensory disturbances. (Tr. at 663).

On April 6, 2017, MRI scans were taken of Claimant's spine. He had very subtle degenerative changes in his thoracic spine with no evidence of metastatic disease or acute disc extrusion or spinal stenosis. (Tr. at 794). In his lumbar spine, he had annular tears at L3-S1 with mild protrusion, but no high-grade stenosis or acute extrusion. (Tr. at 795). Finally, he had multilevel degenerative changes and moderate and severe foraminal narrowing in his cervical spine, including a central disc herniation at C4-C5, but his cord signal was normal. (Tr. at 796).

16

### B. Evaluations and Opinions

On August 19, 2014, prior to Claimant's amended alleged onset of disability on June 4, 2015, Dr. MacFarland provided a note stating that Claimant was "off work secondary to medical issues for 12 months" and would be reevaluated periodically. (Tr. at 380).

On December 31, 2014, Caroline Williams, M.D., evaluated Claimant's RFC based upon her review of Claimant's records. Dr. Williams found that Claimant did not have any exertional or non-exertional limitations. (Tr. at 88). Further, Dr. Williams stated that Dr. MacFarland's August 2014 medical source statement was not well supported by and conflicted with the updated medical evidence in the file. (Tr. at 88, 90). Dr. Williams noted that there was no longitudinal ongoing evaluation or treatment for Claimant's allegations of gastroesophageal reflux disease, hypertension, migraine headaches, temporal arteritis, and osteoarthritis. (Tr. at 89). Further, Claimant's renal cancer that was diagnosed in August 2014 was removed in a partial nephrectomy in November 2014 without complications; there was no evidence of metastasis, and it was judged to be a low risk for recurrence. (*Id.*). Dr. Williams believed that if Claimant continued to recover, he could return to activities within one year of his surgery date. (*Id.*). Rabah Boukhemis, M.D., affirmed Dr. Williams's assessment on March 24, 2015. (Tr. at 103).

On June 4, 2015, Dr. MacFarland completed a physical capacities evaluation form. She listed Claimant's diagnoses as chronic severe pain, especially in his right shoulder/arm; irritable bowel syndrome; hypertension; acid reflux; solitary pulmonary nodule; kidney cancer; and BPH. (Tr. at 551). Dr. MacFarland stated that Claimant suffered pain in his lumbar spine, neck, and bilateral legs and shoulders, which radiated to his arms. (*Id.*). She noted tenderness, crepitus, muscle spasm and weakness, trigger

points, impaired sleep, chronic fatigue, morning stiffness, joint instability, abnormal posture, reduced grip, significantly reduced range of motion, numbness and tingling, and multiple tender joints. (*Id.*). Also, Claimant's pain medication reportedly caused nausea, drowsiness, and stomach upset. (*Id.*). Dr. MacFarland opined that Claimant's symptoms interfered with his attention and concentration most of the time and that Claimant needed to elevate his legs to his waist several times per day and would need to lie down at unpredictable intervals during an eight-hour shift. (*Id.*). In terms of Claimant's functional abilities, Dr. MacFarland stated that Claimant could sit and stand/walk for less than two hours in a work day, could never lift and carry any amount of weight, and could only occasionally perform postural activities, except that he could never kneel or crawl. (Tr. at 552). Further, Dr. MacFarland opined that Claimant's ability to reach, handle, feel, push, and pull were affected by his impairments; that he was significantly limited in his ability to use foot controls; and that he would miss work more than three times per month. (*Id.*).

### C. Claimant's Statements

At his administrative hearing on April 18, 2017, Claimant testified that he lived in a house with his wife. (Tr. at 40). He had a driver's license, but his wife drove when they "went to town" because grasping the steering wheel for very long caused his arms to become numb and tingly. (Tr. at 40-41). Claimant was previously an owner-operator truck driver from 1988 until 2014, but he stated that he could no longer work due to the pain in his back, legs, and neck that also radiated into his arms. (Tr. at 41, 43). He testified that the last four or five years that he worked, he would turn down jobs if he was "hurting too bad" or having a "bad headache," which was feasible because he was self-employed. (Tr. at 58). As to his current condition, Claimant admitted that medication made his pain manageable and knocked the "sharp edges" off of it. (Tr. at 47). Claimant stated that

18

physical therapy actually worsened his condition, but that he sometimes wore a back brace and used a warm towel on his neck to relieve the tension in his muscles. (Tr. at 49-51). He estimated that he could only walk the distance from his house to his mom's house, which was approximately 150 to 175 yards, before needing to sit down. (Tr. at 51). He testified that he could stand for 10 or 15 minutes at a time and that lifting even a gallon of milk was difficult for him. (Tr. at 52). He explained that he lost mobility in his right shoulder due to the rotary tear and had problems reaching above his head. (Tr. at 60-61).

In terms of daily activities, Claimant stated that he took care of his personal hygiene and paid bills, but his wife took care of the household and cooked. (Tr. at 53). He shopped with his wife some, but claimed that he would often need to go sit down due to back pain. (Tr. at 54). Claimant attended a weekly church service for one hour and 45 minutes during which he alternated between standing and sitting several times. (Tr. at 54). Claimant further testified that he and his wife used to be part of a traveling gospel music group that performed on weekends, but he had to quit in 2012 because the pain from standing and holding his guitar was too much. (Tr. at 55). Claimant testified that he now only performed approximately once per month with his wife and children, although he had to cancel his most recent performance because he "couldn't do it." (*Id.*). Claimant stated that in a typical day he ate breakfast, "piddle[d] around the house a little bit," sat down for a while, and walked around outside, if the weather was nice. (Tr. at 55-56). He liked to walk to his barn and sit down and watch the cows eat. (Tr. at 56).

Claimant also testified that he constantly had headaches, including during the hearing. (Tr. at 57). He stated that he had approximately four "bad migraines" per month, but later stated that he had at least two bad migraines per month. (Tr. at 57, 59). He explained that he could feel when a migraine was "coming on" and he took Maxalt

prescribed by Dr. MacFarland, which helped "head it off" three out of four times. (Tr. at 57-58). Claimant described that Maxalt helped the migraine not "get as bad," but it did not work for about one out of four migraines and the only thing that Claimant could do in that case was go lie down in a quiet, dark room. (Tr. at 58). Claimant stated that light really aggravated his migraines. (*Id.*). He claimed that he did not have hardly any migraines for approximately two years, probably only one or two per year, but three years ago the migraines returned "with a vengeance" and were worse than before. (Tr. at 59).

## VI.   <u>Standard of Review</u>

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In *Blalock v. Richardson*, the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock*, 483 F.2d at 776 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). This Court is not charged with conducting a *de novo* review of the evidence. Instead, the Court's function is to scrutinize the record and determine whether it is adequate to support the conclusion of the Commissioner. *Hays*, 907 F.2d at 1456. When conducting this review, the Court does not re-weigh evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 2001) (citing *Hays*, 907 F.2d at 1456)). Moreover, "[t]he fact that the record as a whole might support an inconsistent conclusion is immaterial, for the language of § 205(g) ... requires that the court uphold the [Commissioner's] decision even should the

court disagree with such decision as long as it is supported by 'substantial evidence.'" *Blalock*, 483 F.2d at 775 (citations omitted). Thus, the relevant question for the Court is "not whether the claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig*, 76 F.3d at 589).

## VII.   <u>Discussion</u>

As noted above, Claimant challenges the ALJ's analysis of his migraine headaches and the opinion provided by his treating physician. Each argument is discussed below, in turn.

### *A. Migraine Headaches*

In his first assertion of error, Claimant argues that the ALJ failed to fully account for his migraine headaches in the RFC finding. Specifically, Claimant points to the fact that the ALJ did not limit his exposure to noise or light or find that he would be off-task for any percentage of the time. According to Claimant, the ALJ should have assessed additional limitations to account for his migraine headaches because, according to Claimant, the ALJ did not dispute that Claimant suffered from at least two migraines per month for days at a time, which caused photophobia and phonophobia and required him to lie down in a dark, quiet room until the migraines resolved.

Social Security Ruling ("SSR") 96-8p provides guidance on how to properly assess a claimant's RFC, which is the claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." SSR 96-8p, 1996 WL 374184, at *1. RFC is a measurement of the ***most*** that a claimant can do despite his or her limitations resulting from both severe and non-severe impairments, and the finding is used at steps four and five of the sequential evaluation to determine whether a

claimant can still do past relevant work and, if not, whether there is other work that the claimant is capable of performing. *Id.* According to the Ruling, the ALJ's RFC determination requires "a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." *Id.* at *3. The functions that the ALJ must assess include the claimant's physical abilities, "such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping or crouching);" mental abilities; and other abilities, "such as skin impairment(s), epilepsy, impairment(s) of vision, hearing or other senses, and impairment(s) which impose environmental restrictions." 20 CFR §§ 404.1545(b-d), 416.945(b-d).

Only by examining specific functional abilities can the ALJ determine (1) whether a claimant can perform past relevant work as it was actually, or is generally, performed; (2) what exertional level is appropriate for the claimant; and (3) whether the claimant "is capable of doing the full range of work contemplated by the exertional level." SSR 96-8p, 1996 WL 374184, at *3. Indeed, "[w]ithout a careful consideration of an individual's functional capacities to support an RFC assessment based on an exertional category, the adjudicator may either overlook limitations or restrictions that would narrow the ranges and types of work an individual may be able to do, or find that the individual has limitations or restrictions that he or she does not actually have." *Id.* at *4.

In determining a claimant's RFC, the ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g. laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Id.* at *7. Further, the ALJ must "explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." *Id.* at *7. "Remand may be

appropriate where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015) (quoting *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013)) (markings omitted).

Here, the ALJ's consideration of Claimant's migraine headaches began at step two of the sequential evaluation. The ALJ noted that Claimant's treatment records documented that Claimant suffered from "recurrent migraines for which [Claimant was] maintained on medications such as Maxalt." (Tr. at 18). The ALJ cited Claimant's subjective complaints that he always had a low-grade headache and suffered migraines four times per month, which was an increase from two migraines per month in previous years. (*Id.*). The ALJ discussed that although Claimant's migraines subsided for approximately two years, Claimant stated that they returned three years earlier with a vengeance and while Maxalt eased his symptoms, the migraines remained quite bothersome. (*Id.*). Therefore, the ALJ concluded that Claimant's migraine headaches were a severe impairment. (Tr. at 16).

In assessing Claimant's RFC, the ALJ discussed that Claimant reported a lifelong issue with migraines and stated that he had to push himself to work despite his symptoms, but that his headache pain was occurring more frequently. (Tr. at 23). The ALJ again noted that Claimant reported that his migraines increased in frequency to four times per month with a dull headache on most days. (Tr. at 24). However, the ALJ remarked that Maxalt provided a noted benefit and that Claimant's treatment was limited to prescribed medication with no referral for more aggressive workup or medical management. (Tr. at 26). The ALJ concluded that Claimant's headache pain was effectively managed with

23

routine conservative treatment and the evidence did not support Claimant's allegations of debilitating headache pain. (*Id.*).

Claimant argues that the ALJ's foregoing analysis was insufficient and that the ALJ should have included limitations relating to his photophobia, phonophobia, and need to lie down during his migraines. However, after considering and weighing the evidence concerning Claimant's migraines, the ALJ concluded that no further limitations were warranted in Claimant's RFC due to the fact that Claimant's migraine headaches were effectively managed with routine conservative treatment. The ALJ's finding in this respect was supported by substantial evidence from the record. Claimant testified during his administrative hearing that it was "like [he] constantly [had] a headache," but he admitted that he only suffered two or four "bad migraines" per month and that he could feel when he was getting a migraine and would take Maxalt, which worked to "head off" his migraine three out of four times. (Tr. at 57-59). For that one out of four remaining instances that Maxalt did not treat his migraine, Claimant stated that he needed to go lie down in a quiet, dark room. (Tr. at 58).

Furthermore, while Claimant reported a history of headaches during some of his office visits, his reference to and treatment for headaches composed a minor part of the overall record, which largely focused on Claimant's musculoskeletal complaints and other issues. (Tr. at 499, 500, 576, 582, 609, 774). Claimant told his treating nurse practitioner in March 2015 that his migraines returned in the past two or three years and that in the past two weeks he had two bad migraine episodes and he "gets where [the] room is dark and quiet." (Tr. at 609). He was prescribed Maxalt, which he stated, "helped some," but that he did not use it often. (Tr. at 576). Claimant also, at times, denied having a headache, including as late as October 2016. (Tr. at 614, 579, 663).

The record was otherwise fairly unremarkable regarding Claimant's migraine headaches. As stated by the ALJ, Claimant was never referred for additional testing or more aggressive treatment of any kind. Other than Claimant's isolated reference to his provider that during bad migraines, he "gets where [the] room is dark and quiet," the record failed to substantiate Claimant's alleged functional limitations from his impairment. Indeed, there was not a single piece of evidence from Claimant's treating providers or the agency physicians that indicated that Claimant had any functional limitations relating to sound, light, or being off task due to migraine episodes.

Claimant suggests that because the ALJ did not fully discredit the existence and symptoms of his headaches, that the ALJ was thus obligated to impose RFC restrictions relating to his exposure to sound and light and being off-task. However, the ALJ appropriately concluded, based his review of Claimant's subjective allegations, clinical treatment, medical opinions, and the other evidence in the record, that such limitations were not warranted. Claimant does not point to evidence which the ALJ overlooked, but instead asks the Court to reevaluate Claimant's credibility and reassess Claimant's RFC, which is not the Court's role in reviewing the Commissioner's decision.

"Under the Social Security Act, [a reviewing court] must uphold the factual findings of the Secretary if they are supported by substantial evidence and were reached through application of the correct legal standard." *Vest*, 2016 WL 5334668, at *2 (quoting *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001)) (alteration in original); *see* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive ...."). The Court should not "re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the Secretary" and, if "conflicting evidence allows reasonable minds to differ as to

25

whether a claimant is disabled," the Court must defer to the Commissioner's decision. *Id.* (citations omitted).

In this case, the ALJ's decision demonstrates that the ALJ properly evaluated Claimant's allegations, medical treatment, and evaluations. The ALJ articulated support for the determination that is rooted in the record and consistent with the applicable rules and regulations. *See, e.g., Adrienn R. v. Berryhill*, No. TJS-18-0787, 2019 WL 140888, at *2-3 (D. Md. Jan. 9, 2019) (affirming the ALJ's decision where the ALJ considered the relevant evidence and concluded that no further RFC limitations were warranted regarding the claimant's headaches, noting that the claimant's headache frequency and severity were stable and she responded adequately to therapy); *Propst v. Colvin*, No. 1:16CV00082, 2016 WL 5107093, at *4-6 (M.D.N.C. Sept. 20, 2016) (holding that the ALJ's RFC finding was supported by substantial evidence despite the claimant's argument that the ALJ should have included restrictions to light and sound or simple tasks due to her intractable migraine headaches); *Earl v. Berryhill*, No. 2:17CV546, 2018 WL 7026470, at *11 (E.D. Va. Dec. 21, 2018), *report and recommendation adopted* 2019 WL 192341 (E.D. Va. Jan. 14, 2019) (finding that the ALJ's decision was supported by substantial evidence where the ALJ considered the relevant evidence, including the claimant's complaints of disabling migraines, but the ALJ found that the claimant did not seek emergency care for the condition, the headaches improved with medication, and the objective evidence did not support the claimant's allegations); *but see, e.g., Thrower v. Colvin*, No. 5:15-CV-00290-FL, 2016 WL 4734355, at *4 (E.D.N.C. June 23, 2016), *report and recommendation adopted,* No. 5:15-CV-290-FL, 2016 WL 4734596 (E.D.N.C. Sept. 9, 2016) (recommending remand where the ALJ gave great weight to the state agency opinions, but did not explain why the restrictions related to noise and vibration that the

26

experts assessed based on the claimant's migraine headaches were not included in the ALJ's RFC finding); *Fetter v. Comm'r, Soc. Sec. Admin.*, No. 15-2250-JMC, 2016 WL 3646850, at *2 (D. Md. July 7, 2016) (ordering remand where the ALJ failed to address a treatment note during the claimant's active migraine episode that corroborated the claimant's complaints); *Higgs v. Berryhill*, No. 4:18-CV-22-FL, 2019 WL 848730, at *3 (E.D.N.C. Jan. 10, 2019), *report and recommendation adopted* 2019 WL 845406 (E.D.N.C. Feb. 21, 2019) (finding that the ALJ erred in formulating the RFC by not explaining his conclusion that the claimant would be off-task no more than ten percent of the time in an eight hour work day and by not addressing the claimant's sensitivity to light due to her migraines, despite very significant evidence substantiating her complaints). The three latter cases are distinguishable from the instant action, however, because in each case, the ALJ failed to provide a reasonable explanation of the evidence related to the claimant's migraines. In contrast, here the ALJ clearly considered that Claimant had a long history of migraine headaches, that he had worked in the past with headaches, and his current headaches were responsive to treatment. The ALJ also explained her reasons for discounting Claimant's statements regarding the persistence and disabling qualities of his migraine headaches. As stated, substantial evidence supported the ALJ's findings.

Therefore, for all of the reasons indicated above, the undersigned **FINDS** that the ALJ's assessment of Claimant's headaches and the RFC finding is supported by substantial evidence.

### B. Treating Physician's Opinion

In his next challenge to the Commissioner's decision, Claimant states that the ALJ did not properly consider the June 4, 2015 physical capacities evaluation completed by his treating physician, Dr. MacFarland. In the evaluation, Dr. MacFarland opined that

Claimant could sit for less than two hours and stand/walk for less than two hours in an eight-hour work day, needed to lie down at unpredictable intervals during the day, could never lift/carry any weight, and would miss more than three days of work per month due to his impairments. (Tr. at 551-52). Claimant argues that the ALJ failed to provide good, specific, and supported reasons for rejecting Dr. MacFarland's opinion.

When evaluating a claimant's application for benefits, the ALJ "will always consider the medical opinions in [the] case record together with the rest of the relevant evidence [he] receives." 20 C.F.R. §§ 404.1527(b), 416.927(b). Medical opinions are defined as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [his] symptoms, diagnosis and prognosis, what [he] can still do despite [his] impairment(s), and [his] physical or mental restrictions." *Id.* §§ 404.1527(a)(2), 416.927(a)(2). The regulations outline how the opinions of accepted medical sources will be weighed in determining whether a claimant qualifies for disability benefits. In general, an ALJ should allocate more weight to the opinion of an examining medical source than to the opinion of a non-examining source. *Id.* §§ 404.1527(c)(1), 416.927(c)(1). Even greater weight should be given to the opinion of a treating physician, because that physician is usually most able to provide a detailed, longitudinal picture of a claimant s alleged disability.[1] *Id.* §§ 404.1527(c)(2), 416.927(c)(2). Indeed, a treating physician's opinion should be given ***controlling*** weight when the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques and is

---

[1] As indicated in Claimant's brief, the special deference afforded to the opinion of a treating physician, often called the "treating physician rule," was eliminated for claims filed on or after March 27, 2017. 20 C.F.R. §§ 404.1520c, § 416.920c; *Rescission of Soc. Sec. Rulings 96-2p, 96-5p, & 06-3p*, 2017 WL 3928298 (S.S.A. Mar. 27, 2017). However, Claimant's applications for benefits were filed in 2014 and the former regulations and ruling apply.

not inconsistent with other substantial evidence. *Id*.

If the ALJ determines that a treating physician's opinion is not entitled to controlling weight, the ALJ must then analyze and weigh all the medical opinions of record, taking into account certain factors listed in 20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6), and must explain the reasons for the weight given to the opinions.[2] "Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected ... In many cases, a treating source's opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." SSR 96-2p, 1996 WL 374188, at *4. Nevertheless, in appropriate circumstances, a treating physician's opinion may be rejected in whole or in part in favor of a conflicting opinion by a non-treating source; for example, when the non-treating source's opinion is well-supported by evidence and explanation, is more consistent with the record as a whole, and is offered by a source with specialization in the subject matter of the opinion. *See Brown v. Commissioner of Soc. Sec.,* 873 F.3d 251, 268 (4th Cir. 2017). Ultimately, it is the responsibility of the ALJ, not the court, to evaluate the case, make findings of fact, weigh opinions, and resolve conflicts of evidence. *Hays*, 907 F.2d at 1456.

Medical source statements on issues reserved to the Commissioner are treated differently than other medical source opinions. SSR 96-5p, 1996 WL 374183. In both the regulations and SSR 96-5p, the SSA explains that "some issues are not medical issues

---

[2] The factors include: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) other factors bearing on the weight of the opinion.

regarding the nature and severity of an individual's impairment(s) but are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability," including the following:

> 1. Whether an individual's impairment(s) meets or is equivalent in severity to the requirements of any impairment(s) in the listings;
>
> 2. What an individual's RFC is;
>
> 3. Whether an individual's RFC prevents him or her from doing past relevant work;
>
> 4. How the vocational factors of age, education, and work experience apply; and
>
> 5. Whether an individual is "disabled" under the Act.

*Id.* at *2. "The regulations provide that the final responsibility for deciding issues such as these is reserved to the Commissioner." *Id.* Consequently, a medical source statement on an issue reserved to the Commissioner is never entitled to controlling weight or special significance, because "giving controlling weight to such opinions would, in effect, confer upon the [medical] source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine when an individual is disabled." *Id.* at *2. Still, these opinions must always be carefully considered, "must never be ignored," and should be assessed for their supportability and consistency with the record as a whole. *Id.* at *3.

In this case, the ALJ discussed Dr. MacFarland's June 2015 opinion, noting that Dr. MacFarland assessed that Claimant was incapable of lifting any weight at all or sitting, standing, and walking even up to two hours per day. (Tr. at 25). In addition, Dr. MacFarland assessed that due to his musculoskeletal impairments Claimant would need

to elevate his legs at waist level, lie down at unpredictable intervals during the day, perform extremely limited postural activities, and would miss work more than three days per month due to his impairments. (*Id.*). However, the ALJ stated that upon thorough review of the record, she concluded that while the evidence supported that Claimant's musculoskeletal issues limited his ability to sit, stand, push, pull, manipulate objects, and navigate hazards, it simply did not support the extreme limitations assessed by Dr. MacFarland. (Tr. at 25). The ALJ remarked that it appeared that Dr. MacFarland predominately relied on Claimant's subjective complaints, as opposed to objective evidence, because even Dr. MacFarland's own treatment notes did not reflect that Claimant's impairments were manifested to the degree of severity that Dr. MacFarland assessed. (*Id.*). Further, the ALJ considered the fact that no other treating or examining physician advanced the degree of limitations assessed by Dr. MacFarland. (*Id.*).

The ALJ then pointed to specific pieces of evidence that was inconsistent with Dr. MacFarland's opinion. First, the ALJ noted that in the months after Dr. MacFarland authored the opinion, Dr. MacFarland recorded normal musculoskeletal and neurological examinations in August and October 2015 and stated that Neurontin, steroids, and Toradol had proven effective in reducing Claimant's symptoms. (*Id.*). The ALJ explained that, in fact, Dr. MacFarland documented that treatment helped "quite a bit." (*Id.*). Furthermore, the ALJ cited that during more recent examinations with Dr. MacFarland in June and July 2016, Claimant complained of only moderate pain and related that Baclofen was beneficial for his muscle cramps and Maxalt helped his headaches. (Tr. at 25-26). The ALJ considered that the record did not document any further medical follow-up with Dr. MacFarland. (Tr. at 26).

Furthermore, the ALJ noted that during Claimant's August 2015 examination, Dr.

31

Ignatiadis observed that Claimant had full range of motion in his spine, no muscle spasm or point tenderness, excellent strength in his extremities, no evidence of myelopathy or radiculopathy, and intact sensation and reflexes. (Tr. at 26). Then, in December 2015, Dr. Ignatiadis recorded that although Claimant showed some evidence of chronic, right C6 cervical radiculopathy, Claimant's cervical spine pain was considerably improved to only two or three on a ten-point scale and Claimant still had full range of motion in his spine, no muscle spasm, and full strength in his extremities. (*Id.*). Furthermore, his gait was normal, and his shoulder function was improved. (*Id.*). The ALJ discussed that while imaging in 2016 and 2017 showed disc degeneration in Claimant's lumbar spine and multi-level annular tears, Claimant's lumbar spine motility was reduced by half, and his straight leg raising test was positive on the right, his degeneration was documented to be only mild and moderate and there was no high-grade stenosis or acute extrusions and only minimal or mild foraminal narrowing in Claimant's spine. (*Id.*). In addition, Claimant's shoulder pain had likewise considerably improved to two on a ten-point scale. (*Id.*). The ALJ noted that there were no further records from Dr. Ignatiadis. (*Id.*).

In addition to Claimant's clinical treatment, the ALJ considered the objective evidence that Claimant's thoracic spine showed only subtle degenerative changes without any significant disc bulging or extrusion and there was no subsequent imaging of Claimant's cervical spine. (*Id.*). Furthermore, the ALJ discussed that the record was devoid of any surgical intervention in Claimant's spine or shoulder or further physical therapy. (*Id.*). In fact, the ALJ noted that the record reflected little medical follow-up in the year preceding the ALJ's decision for Claimant's reported shoulder or spinal issues. (*Id.*). The ALJ further noted that Claimant admitted that his right shoulder pain was not as severe as when his rotator cuff tear was discovered. (*Id.*). For his musculoskeletal

32

issues, Claimant only occasionally used a back brace and took medication which took "the edge off" and made his pain manageable. (*Id.*). Claimant did not use a TENS unit, nor did he require significant emergent care treatment or hospitalization for chronic pain issues. (*Id.*). In terms of his daily activities, Claimant conceded that he remained capable of performing light household chores. (*Id.*). Overall, in consideration of all of the above evidence, the ALJ gave little weight to Dr. MacFarland's June 2015 opinion regarding Claimant's functional abilities. (Tr. at 25).

The ALJ's decision to afford little weight to Dr. MacFarland's opinion based on its inconsistency with Dr. MacFarland's own treatment notes and the rest of the record is supported by substantial evidence. Claimant told Dr. Ignatiadis in August 2015 that he had "some" back and hip pain and chronic neck pain, but that his main problem was his right shoulder. (Tr. at 648). Dr. Ignatiadis found that Claimant's partial rotator cuff tear in his right shoulder restricted his movement in that joint and caused pain. (Tr. at 650). Otherwise, Dr. Ignatiadis concluded that Claimant had degenerative changes with stenosis at C5-C6, causing radiculopathy on Claimant's right side, but the issues did not have any "intimacy to the spinal cord." (*Id.*). Functionally, as the ALJ noted, Claimant retained full range of motion in his spine, excellent strength in his extremities, and intact sensation and reflexes. (Tr. at 649).

On the date that Dr. MacFarland completed the physical capacities evaluation in June 2015, despite Claimant's complaint that his neck and shoulder pain sometimes took him to his knees and his examination that showed reduced range of motion and strength in his right arm and shoulder, Claimant was grossly intact neurologically without any focal deficits. (Tr. at 576-77). Subsequently, in October and December 2015, Claimant had normal musculoskeletal and neurological examinations, except for decreased sensation

in his C6 nerve distribution. (Tr. at 582, 646-47). He reported in April 2016 that his shoulder pain improved to the point that he had only some residual pain and difficulty raising his arm overhead. (Tr. at 642). Also, although he showed evidence of cervical and lumbar radiculopathy, his 2017 MRIs showed only subtle degenerative changes in his thoracic spine, annular tears with mild protrusion and no high-grade stenosis or extrusion in his lumbar spine, and degenerative changes and a herniated disc in his cervical spine with moderate and severe foraminal narrowing, but normal cord signal. (Tr. at 794-96).

For the reasons stated above, there was certainly more than a scintilla of evidence to support the ALJ's analysis that Dr. MacFarland's physical capacities evaluation was inconsistent with the medical evidence in the record and thus entitled to little weight. Furthermore, to the extent Claimant argues that the ALJ focused on the supportability and consistency of Dr. MacFarland's opinion, but failed to explicitly discuss the other factors that Claimant argues "favor[ed] an award of benefits" to Claimant, the undersigned notes that while 20 C.F.R. §§ 404.1527(c), 416.927(c) provide that medical opinions must be evaluated and weighed based upon various factors, the regulations do not explicitly require the ALJ to recount the details of that analysis in the written opinion. Instead, the regulations mandate only that the ALJ give "good reasons" in the decision for the weight ultimately allocated to medical source opinions. *Id.* §§ 404.1527(c)(2), 416.927(c)(2); *see also* SSR 96-2p, 1996 WL 374188, at *5 ("[T]he notice of the determination or decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that

weight."). "[W]hile the ALJ also has a duty to 'consider' each of the ... factors listed above, that does not mean that the ALJ has a duty to discuss them when giving 'good reasons.' Stated differently, the regulations require the ALJ to consider the ... factors, but do not demand that the ALJ explicitly discuss each of the factors." *Hardy v. Colvin,* No. 2:13–cv–20749, 2014 WL 4929464, at *2 (S.D.W. Va. Sept. 30, 2014).

Overall, while Dr. MacFarland was Claimant's treating physician and her opinion of Claimant's functional abilities would have been entitled to deference at the time of the ALJ's decision, the ALJ very clearly articulated good reasons for affording her opinion little weight and the ALJ's analysis is supported by substantial evidence from the record. Therefore, fall of the above reasons, the undersigned **FINDS** that the ALJ properly considered and weighed Dr. MacFarland's June 2015 treating source opinion in this matter.

## VIII.  <u>Recommendations for Disposition</u>

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding District Judge confirm and accept the findings herein and **RECOMMENDS** that the District Judge **DENY** Plaintiff's motion for summary judgment, (ECF No. 11); **GRANT** the Commissioner's request for judgment on the pleadings, (ECF No. 12); **AFFIRM** the decision of the Commissioner; **DISMISS** this action, with prejudice, and remove it from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (if received by mail)

from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Thomas v. Arn*, 474 U.S. 140 (1985); *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Chambers, and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED**: April 15, 2019

Cheryl A. Eifert
United States Magistrate Judge